Peter J. BRENNAN, Secretary of Labor, United States Department of Labor, Plaintiff-Appellant,

v.

The KROGER COMPANY, a corporation, Defendant-Appellee.

No. 74–1726.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 9, 1975.

Decided April 9, 1975.

Bobbye D. Spears, Deputy Assoc. Sol., U. S. Dept. of Labor, Washington, D. C., for plaintiff-appellant.

William L. Sweet, Jr., Fort Wayne, Ind., for defendant-appellee.

Before FAIRCHILD, Chief Circuit Judge, TONE, Circuit Judge, and PERRY, Senior District Judge.*

PERRY, Senior District Judge.

This is an appeal from an order of the District Court granting summary judgment in favor of defendant below, The Kroger Company [hereinafter "Kroger"] and against plaintiff below, Peter J. Brennan, Secretary of Labor, United States Department of Labor [hereinafter "the Secretary"], in an action brought by the Secretary to enforce Title III of the Consumer Credit Protection Act, § 301 et seq. (P.L. 90–321, 82 Stat. 163), 15 U.S.C. § 1671 et seq. [hereinafter "the Act"]. By § 306 of the Act, 15 U.S.C. § 1676, the Secretary, acting through the Wage and Hour Division of the Department of Labor, is charged with enforcing Title III of the Act.

In June 1970, Kroger, a retail food dealer engaged in interstate commerce, hired one Johnnie Boyd as a railroad car gang employee. On September 22, 1970, an order [hereinafter "the first order"] was entered by the Justice of the Peace Court, Wayne Township, Allen County, Indiana, directing Kroger to apply the earnings of Boyd to the satisfaction of a judgment previously entered against him. The next day Kroger was served with the order and immediately thereafter began to withhold from Boyd's wages the maximum amount permitted by Indiana law. A month later, on October 22, 1970, the same Justice of the Peace Court entered a second order, directing Kroger to apply the earnings of Boyd to the satisfaction of another judgment, based on a debt unrelated to the debt which gave rise to the first order. Service on Kroger of the second order was accomplished on October 23, 1970, and, as a result, Kroger discharged Boyd effective October 31, 1970 in accordance with company policy and as permitted by the collective bargaining agreement then in force. The Justice of the Peace Court entered two distinct orders based on two separate debts and both orders were properly served on Kroger. Since the maximum amount permitted by law was being withheld from Boyd's wages pursuant to the first order, no actual withholding whatever was made from Boyd's wages pursuant to the second order. By their terms, both of the orders were in the nature of continuing liens against the earnings of Boyd, and the order which was first in time was entitled to full satisfaction before any withholding could be made for the purpose of satisfying the second order.

On September 13, 1971 the Secretary instituted this action, alleging that Kroger had discharged Boyd in violation of § 304(a) of the Act in that the discharge was by reason of the fact that Boyd's earnings had been subjected to garnishment for only one indebtedness. Section 304(a) of the Act, 15 U.S.C. § 1674(a), provides:

> No employer may discharge any employee by reason of the fact that his earnings have been subjected to garnishment for any one indebtedness.

Thereafter Kroger moved for summary judgment, arguing that service of a second court order—which under Indiana law created a continuing lien against the earnings of Boyd—amounted to a second subjection to garnishment within the meaning of the Act, and that the restriction of § 304(a) was therefore inapplicable. The Secretary, on the other hand, contended that since there was not nor could there be any actual withholding

* Senior District Judge Joseph Sam Perry of the Northern District of Illinois is sitting by designation.

under the second order until a first order had been fully satisfied, Boyd had been discharged because his earnings had been subjected to garnishment for only one indebtedness, in violation of § 304(a). In granting Kroger's summary judgment motion, the District Court equated service of the second order with subjection to garnishment within the meaning of the Act.

■ This case is before us for the resolution of a single issue. We must decide whether an employee's earnings have been subjected to garnishment for more than one indebtedness within the meaning of the Act by the service on an employer of a second garnishment order which rendered the employer accountable for the employee's earnings but which did not, because of the pendency of a superior lien, require the withholding of any of the employee's earnings.

The Secretary contends that both the language of Title III and the legislative history thereof demonstrate that the second order served on Kroger did not constitute a second subjection to garnishment which would justify Boyd's discharge. We agree.

Garnishment is defined in § 302(c) of the Act, 15 U.S.C. § 1672(c), as "any legal or equitable procedure through which the earnings of any individual are required to be withheld for payment of any debt." The Secretary argues, and we agree, that the use of the present tense, rather than the future tense, in the phrase "are required to be withheld" supports a construction that in order for earnings to "have been subjected to garnishment," those earnings must first be actually withheld pursuant to a garnishment order.

We turn now to the legislative history of Title III.[1] After taking many hours of testimony and studying hundreds of pages of discussion and data on the subject of garnishment, the House Banking and Currency Committee, and particularly Congresswoman Leonor Sullivan's Subcommittee on Consumer Affairs, decided that garnishment was a serious national problem and that at least a minimum national standard should be established for the garnishment of wages.[2] In the hearings on H.R. 11601, the proposed Consumer Credit Protection Act, Congressman Frank Annunzio was moved to say:

> . . . There are four titles to H.R. 11601. If we lose all the titles and retained only the garnishment section we would be doing more for the consumers of America than has been done at any time during the history of this country. The record bears this out.[3]

Representatives of three major steel corporations—Inland, United States, and Republic—testified in subcommittee hearings that garnishment deductions from the wages of their employees was a heavy, unwanted administrative expense.[4] These corporations, along with trade union groups, endorsed restrictions on wage garnishment.[5] In a letter to Congresswoman Sullivan, Secretary of Labor Willard Wirtz stated that there was a widespread opinion among judges, lawyers, economists and bankruptcy referees that there is a correlation between consumer bankruptcies and wage garnishments, and that a study in 1965 by the Administrative Office of the United States Courts showed that bankruptcies were highest where wage garnishments were least restricted.[6]

1. Examination of the legislative history of Title III of the Act was greatly facilitated by the prior efforts of Miss Charlotte Stillwell, Reference Librarian, Cook County Law Library, Chicago, Illinois. In a three-volume work entitled "Legislative History of the Consumer Credit Protection Act", Miss Stillwell has gathered a most comprehensive collection of House and Senate documents pertaining to the legislative history of the Act.

2. 114 Cong.Rec. 1840 (1968).

3. Hearings on H.R. 11601 Before the Subcomm. on Consumer Affairs of the House

Comm. on Banking and Currency, 90th Cong., 1st Sess. pt. 1, at 540 (1967) [hereinafter cited as Hearings].

4. 114 Cong.Rec. 1833 (1968)

5. H.R.Rep.No.1040 (on H.R. 11601), 90th Cong., 1st Sess. (1967) [hereinafter cited as H.R.Rep.No.1040], U.S.Code Cong. & Admin. News, 90th Cong., 2nd Sess. (1968) at, p. 1978.

6. Secretary of Labor letter of Sept. 6, 1967, printed in Hearings at 794.

In their report on H.R. 11601, the House Committee on Banking and Currency stated that as originally introduced, Title II of the bill [now Title III of the Act] would have provided for a blanket prohibition against the garnishment of wages, but testimony before the committee showed that a total prohibition would unduly restrict honest and ethical creditors and that, accordingly, the committee adopted an amendment [introduced by Congressman Seymour Halpern] which would restrict instead of prohibit garnishment, while prohibiting an employer from discharging any employee by reason of a single garnishment of the employee's wages. The committee stated that testimony and evidence received by the committee clearly established a causal connection between harsh garnishment laws and high levels of personal bankruptcies, and that four United States Referees in Bankruptcy had testified eloquently to this causal connection and had endorsed the need for restricting the garnishment of wages.[7]

It is obvious to us that Congress, in enacting Title III, intended to protect employees from the adverse effects of garnishment proceedings and discharges based thereon. The far-reaching consequences of discharge because of garnishment are well summarized in Johnson v. Pike Corp. of America, 332 F.Supp. 490, 496 (C.D.Cal.1971), where the court said:

> Discharging an employee solely because his wages have been garnisheed . . . benefits no one; the employer loses an otherwise capable employee and must expend considerable time and effort to train a replacement; the employee loses his source of income and may become dependent upon unemployment compensation or welfare; and the creditor is less likely to recover his claim. . . .

In the light of the foregoing, we believe that it would frustrate the intent of Congress for us to construe the "subjected to garnishment" language of § 304(a) as being satisfied by the mere service of a second garnishment order

upon Kroger. To enhance the preservation of an employee's job is clearly a dominant purpose of Title III, and for us to hold that Kroger can discharge Boyd because of mere service of the second order would do violence to this purpose. Further, we do no believe that the monitoring of an employee's payroll account which is occasioned by the mere service of a second order will impose an undue burden upon an employer, although we acknowledge the inconvenience which is involved.

■ We agree with the District Court that under Indiana statutes governing garnishment and proceedings supplementary to execution, an obligation is imposed upon an employer upon mere service of a second order—an obligation to record the order, to monitor the employee-debtor's payroll account and, upon the discharge of superior liens, to insure that withholding is instituted for any non-discharged subordinate liens. We do not believe, however, that this obligation under state law should be used as a premise for concluding that, under federal law, the employee's "earnings have been subjected to garnishment."

■ Finally, we recognize the venerable principle that when faced with a problem of statutory construction, courts give great deference to the interpretation of the administrator who is charged with the administration or enforcement of a statute. See, e. g., Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), reh. denied, 380 U.S. 989, 85 S.Ct. 1325, 14 L.Ed.2d 283. In regard to § 304(a) of the Act, the Administrator of the Wage and Hour Division of the Department of Labor, who under the Secretary is charged with enforcing Title III, has said:

> Your first question asks what is meant by "subjected to garnishment". In our opinion an individual's earnings are "subjected to garnishment" within the meaning of section 304(a) of the CCPA when the employer (garnishee) is bound to withhold compensation

7. H.R.Rep.No.1040, U.S.Code Cong. & Admin.News, 90th Cong., 2nd Sess. (1968) at p. 1978.

 

from an employee and would be liable to the judgment creditor if he disregards any order of the court to this effect. There would be no subjection to garnishment before this time. For example, if a judgment debtor obtains a release from the judgment creditor before the· actual entry of the order directing that an execution issue against the earnings of an employee, there is no subjection of his earnings to garnishment.

Wage-Hour Administrator Opinion Letter No. 1136 (WH–89), Oct. 26, 1970, CCH Lab.L.Rep. ¶ 30,703.

Although it cannot be argued that an administrative interpretation of a statute is controlling, nonetheless the Administrator's interpretation is entitled to great weight and should be followed unless there are compelling indications that it is wrong. *See* Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). We find no compelling indications that the Administrator was wrong when he said in the above-quoted paragraph:

. . . [A]n individual's earnings are "subjected to garnishment" within the meaning of section 304(a) of the CCPA *when the employer* (garnishee) *is bound to withhold compensation* . . . *There would be no subjection to garnishment before this time.* . . . (emphasis added.)

In agreeing with the Secretary, as we do, that the Administrator's views support a construction that an actual withholding of wages must occur before earnings are deemed "subjected to garnishment", we do not imply an acceptance of the Secretary's intimation that the above-quoted ruling of the Administrator was a contemporaneous construction of the Act (Brief of Appellant at 28). The opinion letter was written some twenty-nine months after the passage of the Act and is too far removed in time to be considered contemporaneous. *See* Brennan v. General Telephone Co. of Florida, 488 F.2d 157, 160 (5th Cir. 1973).

In view of all of the foregoing, we believe that the District Court erred both in concluding that Kroger did not violate Title III of the Act and in awarding summary judgment to Kroger. Accordingly, the judgment of the District Court is Reversed, and the cause is remanded for further proceedings not inconsistent with this opinion.